IN THE TAX COURT OF THE
STATE OF OREGON

Daniel D. SAGAITIS et al
*v.*
CITY OF WALDPORT
(TC 4008)

Petitioners appeared *pro se.*

David M. Gordon, Macpherson, Gintner, Gordon & Diaz,
Newport, represented respondent.

Decision for respondent rendered December 18, 1996.

**CARL N. BYERS, Judge.**

Petitioners are interested taxpayers challenging the
City of Waldport's (city) 1996-97 tax levy on the ground that
the city violated provisions of the local budget law. The city
responds that the levy should remain undisturbed because
the irregularities, if any, were not significant.

## FACTS

The essential facts are largely undisputed. At a special election held September 15, 1992, the city's voters approved issuing bonds to finance $2 million of the $4.1 million cost of a new sewage treatment plant. The balance of the cost was to be paid by grants from the Farmer's Home Administration (FmHA) and the State of Oregon. At the beginning of construction, the city established a Sewer Facilities Project Fund within its accounting system. All expenditures for the sewage treatment plant were to be paid from that fund. Early in 1995, near the end of the construction period, the fund became depleted because it had not yet received the final payment from FmHA.

The temporary deficit in the Sewer Facilities Project Fund was not discovered due to several circumstances. Prior to the deficit occurring, the city manager, who possessed the primary accounting skills relied upon by the city, left city employment. That left the remaining staff overwhelmed and without the skills needed to reconcile the books. As a result, the city's financial records for the first six months of 1995 were not kept current. During this time, the city did not know how much money it had in each account.

Another factor arising during the construction period was the city's decision to change its method of holding city funds. It withdrew its cash reserves from segregated individual accounts at the local bank and placed them in a local government investment pool (LGIP) where the funds would earn a higher rate of interest. It appears that under this pooled arrangement, the city records were the only records of the balance in each city account. When the city records fell behind, the city was unable to track the balances in each account.

As a result of the above circumstances, the city was unable to know the status of the Sewage Facilities Project Fund near the end of construction. It proceeded to pay the construction bills even though the Sewage Facilities Project Fund had no funds. The money used to pay those bills was in effect taken from other city accounts which had positive balances. The city characterizes paying the construction bills with money from other funds as inadvertent "borrowing."

This borrowing was not discovered until October 1995, when the auditor completed the audit of the 1994-95 financial records. That audit shows the Sewage Facilities Project Fund was overdrawn $91,523. Also in October 1995, the city had completed construction of the sewage treatment plant and received the final payment from FmHA of $99,240. This amount became available to repay the other city funds, but apparently no action was taken to do so until the end of the 1995-96 fiscal year.

During the budget deliberations for the 1996-97 budget, the budget committee was made aware of the "borrowing" and the FmHA payment. When the draft budget was submitted to the budget committee at the May 8, 1996, meeting, it was proposed that the city should allocate the grant money equally among the Water, Sewer, and General Funds as a repayment of the internal borrowing.[1] The lead petitioner, Daniel Sagaitis, who is a member of the city's budget committee, moved to have the $99,240 transferred from the Sewer Facilities Project Fund to the Sewer General Obligation Debt Service Fund. He was of the opinion that transferring the money to reimburse the other city funds was unlawful.

At a follow-up meeting of the budget committee on May 15, 1996, the city manager explained that the $99,240 should not be considered as revenue but as reimbursements from internal borrowing. He proposed adjusting the beginning balances accordingly for the Water Fund, the Sewer Fund, and the General Fund. Sagaitis participated in the discussion and the committee voted to make those adjustments.

The proposed budget, as approved by the budget committee, was presented to the city council on June 27, 1996. In that meeting, the city manager indicated that the 1995-96 books would be closed and reconciled as soon as possible. In the meantime expenditures would be kept to an "absolute minimum" until the auditor reconciled the books and the city knew the exact financial results for that year. At

---

[1] It is not clear why this was recommended because the 1994-95 audit showed the total amount was owing to different city funds, the largest amount owing to the Urban Renewal Fund.

that meeting, the city council passed Resolution 790, which provides, in relevant part:

"WHEREAS, prior to the receipt of the final disbursement of funds from Farmers Home Administration, the City expended monies from its various municipal funds for the purpose of constructing the new wastewater treatment facility, which funds should have constituted loans from the respective City funds to the sewer facilities project fund, but which funds were not so memorialized pursuant to municipal resolution or reflected in the City of Waldport budget; and

"WHEREAS, it is the intent of the City Council to acknowledge by this resolution that such loans should have occurred, which loans have now been repaid by receipt of the final disbursement from Farmers Home Administration; and

"WHEREAS, the City Council has determined that it is difficult, if not impossible, to determine with precision the precise amount of funds loaned from any particular fund to the sewer facilities project and that allocation among the City of Waldport Sewer Fund, the City of Waldport Water Fund, and the City of Waldport General Fund is the most reasonable and prudent manner of allocating the funds received from Farmers Home Administration,

"NOW, THEREFORE, be it hereby resolved by the City Council of the City of Waldport that the final installment of Farmers Home Administration funds received on account of the construction of the wastewater treatment plant be allocated among the City of Waldport Sewer Fund, the City of Waldport Water Fund, and the City of Waldport General Fund * * *."

From the city's point of view, this resolution resolved the problem uncovered in the 1994-95 audit. Accordingly, the city council adopted the 1996-97 budget without any provision for a Sewer Facilities Project Fund because it had closed that fund.

One of the former city managers testified that the transfers were done on an estimated basis because there was no paper trail that would enable the city to determine exactly which funds were drawn on to pay the sewer project bills. Although the resolution occurred just before the 1996-97

budget was adopted, the current city manager testified that the transfer was made earlier and was reflected in the 1996-97 budget by reducing the beginning cash balances. He viewed the resolution as just an official acknowledgment of the errors made during the 1994-95 fiscal year and the necessary corrective action. As of June 30, 1996, the Sewer Facilities Project Fund was finally accounted and closed.

The auditor who performed the 1994-95 audit reported that the "debt" from the internal borrowing of $91,523 was owed to the Urban Renewal Fund ($86,000), the Sewer Operating Fund ($5,169), the Water Operating Fund ($344), and the Water Tank Repair Fund ($10). However, for reasons not clear to the court, the audit shows that when the Sewer Facilities Project Fund was closed out, the cash balance of $75,909 and the liabilities of $91,523 were transferred to the Sewer Operating Fund. This resulted in the Sewer Operating Fund owing a total of $106,354 at the end of the 1995-96 fiscal year.

Taxpayers claim that these actions violate the local budget law. Specifically, taxpayers claim that as of the end of the 1995-96 year, the Sewer Facilities Project Fund had a cash balance of $75,909.[2] At that point, construction of the facility was complete and all bills had been paid. Therefore, taxpayers believe the $75,909 was an unused resource that should have been transferred to the Sewer General Obligation Debt Service Fund to reduce the bonded indebtedness.

Secondly, taxpayers contend that the $99,240, received in October 1995 from FmHA, was in addition to the $75,909 balance in the Sewer Facilities Project Fund and should not have been transferred by Resolution 790. Taxpayers claim the $99,240 was an additional budget resource that should have been shown and would decrease the amount of taxes needed to balance the budget.

Taxpayers also claim other resources were not accurately shown. Specifically, taxpayers claim that the pooled investment fund actually earned interest of $26,280.17,

_____

[2] Petitioner Sagaitis agreed that the court could rely upon proposed audited figures as opposed to figures shown in other unaudited financial statements.

rather than the $1,739.82 shown in the city's financial statement, leaving $24,540.35 unaccounted for.

## ISSUES

(1)   Did the city violate local budget law by transferring $99,240 to reimburse other city funds?

(2)   Did the city fail to show appropriate resources for the Sewer Facilities Project Fund or interest earnings?

## ANALYSIS

■      The local budget law (ORS 294.305 to ORS 294.565)[3] governs municipal corporation budgets. The purpose of the law is to establish standard procedures for the preparation, presentation, administration, and appraisal of budgets, and:

> "To enable the public, taxpayers and investors to be apprised of the financial policies and administration of the municipal corporation in which they are interested." ORS 294.321(6).

The Oregon Tax Court is given limited jurisdiction to hear challenges to tax levies on the grounds that they are made in violation of the local budget law. ORS 294.485(3) provides:

> "If the court finds that the budget and the tax levy in question were not prepared and made in substantial compliance with ORS 294.305 to 294.565 and any other applicable law relating to the making of tax levies, it shall declare void or modify any such tax levy and shall direct that such action be taken, all as in the circumstances it shall deem appropriate."

Taxpayers challenge the city's 1996-97 tax levy on the ground that the budget did not accurately reflect the resources, resulting in excess taxes being levied. However, taxpayers are mistaken as to the amounts. The city received the $99,240 grant in the fall of 1995. Consequently, when the audit for 1995-96 was completed showing a cash balance of $75,909 as of June 30, 1996, it must have reflected the $99,240 already received. Furthermore, the 1994-95 audit

---

[3] All references to the Oregon Revised Statutes are to 1995.

also showed that the Sewer Facilities Project Fund owed other city funds $91,523, leaving it in a deficit position. From the documents submitted by the parties, it is not clear how the city actually resolved the deficit in the Sewer Facilities Project Fund. Resolution 790 indicates the money was transferred from the Sewer Facilities Project Fund to the General, Sewer, and Water Funds. The audited financial statements indicate the $99,240 was transferred to the Sewer Operating Fund and, after the transfer, that fund owed $106,354 to other funds. However it was accomplished, the audited financial statements show there was no positive balance in the Sewer Facilities Project Fund once the money owed to the other funds had been repaid.

■　　　Petitioners contend that the debt from internal borrowing should not have been repaid because the borrowing was never documented. The local budget law requires that loans from one fund to another be authorized by an ordinance or a resolution. *See* ORS 294.460. Admittedly, no ordinance or resolution authorized the loans here.

■　　　For the court to void or modify a levy, it must find that the budget was not prepared in "substantial compliance" with local budget law. ORS 294.485(3). Here, the facts indicate the "borrowing" that occurred during the course of the 1994-95 fiscal year was caused by lack of training and experience and was not intentional. Such mistakes are not uncommon for small cities and districts whose modest budgets do not permit extensive training of employees. The mistake was corrected during the year it was discovered with no carryover to future years. The mistake did not result in a distortion of budget estimates or mislead taxpayers as to the amount of the city's resources. The city publicly acknowledged the mistake and adopted Resolution 790 in an effort to ratify the loans and to take appropriate steps to correct the situation.

■　　　The court finds that although the inadvertent borrowing and repayment acknowledged by Resolution 790 was a technical violation of ORS 294.460, it did not prevent the budget and tax levy from being prepared in substantial compliance with the local budget law.

Taxpayers also claim that the city failed to post interest revenue of $24,540.35 from the LGIP to its ledgers

for the 1995-96 year. Taxpayers point out that the summary of the city's interest income from the LGIP during 1995-96 totaled $26,280.17. They assert that only $1,739.82 was reported by the city, and question where the remaining $24,540.35 is shown.

Taxpayers' concerns regarding the posting are directed at what is admittedly an unaudited statement as of June 1996. In view of the city's accounting problems, a more accurate indication would be the audit report for 1995-96. That document shows total interest received during 1995-96 was $32,192. The 1996-97 budget indicates the city anticipates having received $18,493 in interest in 1995-96. Consequently, taxpayers' concerns seem unjustified.

Taxpayers also claim that the Sewer General Obligation Debt Service Fund should anticipate at least $4,250 in interest income during 1996-97. The 1996-97 budget shows the actual interest received by that account in 1993-94 was zero and in 1994-95 was $271.96. The city budgeted $3,000 for 1995-96 and actually received $4,241 during that fiscal year. Taxpayers are asking the court to require the city to anticipate it will receive an equal amount of interest in 1996-97. However, the amount of revenue that will be received in the future, particularly interest, will depend upon a number of factors including administrative policies. Accordingly, these are judgments to be made by the budget officer, the budget committee and the governing body. Those individuals or groups may know of circumstances or plans that will have the same results as other years when no interest was received. The court will not impose its judgment on the city regarding such matters unless there is abundant proof that the city has erred. Taxpayers have not provided any such proof.

In summary, the court finds that the violations of ORS 294.460 were technical and inadvertent. The court further finds that the budget was prepared in substantial compliance with the local budget law and taxpayers' petition must be denied. Judgment will be entered accordingly.