Argued and submitted November 3, 2000, decision of Court of Appeals and
judgment of circuit court affirmed June 21, 2002

Gary GARRISON
and Heather Garrison,
*Petitioners on Review,*

*v.*

DESCHUTES COUNTY,
*Respondent on Review.*

(CC 96-CV-0397-ST; CA A101360; SC S46886)

48 P3d 807

W. Eugene Hallman, Pendleton, argued the cause and filed the brief for petitioners on review. With him on the brief was Brant M. Medonich, Bend.

Gregory P. Lynch, Bend, argued the cause and filed the brief for respondent on review. With him on the brief were Stanley D. Austin and Hurley, Lynch & Re, P.C., Bend.

Kathryn H. Clarke, Portland, filed a brief for *amicus curiae* Oregon Trial Lawyers Association.

Before Carson, Chief Justice, and Gillette, Durham, Leeson, and Riggs, Justices.**

GILLETTE, J.

Durham, J., dissented and filed an opinion.

---

** Van Hoomissen, J., retired December 31, 2000, and did not participate in the decision of this case; Kulongoski, J., resigned June 14, 2001, and did not participate in the decision of this case; De Muniz and Balmer, JJ., did not participate in the consideration or decision of this case.

**GILLETTE, J.**

This personal injury case requires us to examine the scope of the immunity from liability that the Oregon Tort Claims Act (OTCA) grants to certain kinds of discretionary decisions of a public body. The case arose when plaintiff Gary Garrison[1] was injured when he fell from a raised concrete slab onto a lower slab at a Deschutes County (county) refuse transfer station. Plaintiffs brought the present action against the county, alleging three specifications of negligence. The county moved for summary judgment, asserting that, by virtue of ORS 30.265(3)(c),[2] it was immune from liability for the acts that plaintiffs alleged. The trial court agreed. On plaintiffs' appeal, the Court of Appeals affirmed, holding that: (1) the doctrine of qualified immunity protected the exercise of discretion by county employees in designing the transfer station; and (2) the county's failure to warn plaintiffs of the obvious danger of falling off the higher slab did not expose plaintiffs to a greater risk of harm than if they had been warned. *Garrison v. Deschutes County*, 162 Or App 160, 986 P2d 62 (1999). We allowed plaintiffs' petition for review and now affirm.

Because this case comes to us on review of a grant of summary judgment, we view the facts and all reasonable inferences that may be drawn from them in favor of plaintiffs, the nonmoving parties. *Robinson v. Lamb's Wilsonville Thriftway*, 332 Or 453, 455, 31 P3d 421 (2001). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. ORCP 47 C. The parties accept the following recitation of the facts by the Court of Appeals:

---

[1] Plaintiffs are Gary Garrison, who seeks damages for his own injuries, and Heather Garrison, his wife, who seeks damages for loss of consortium.

[2] ORS 30.265(3) provides, in part:

"Every public body and its officers, employees and agents acting within the scope of their employment or duties * * * are immune from liability for:

"* * * * *

"(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

"Gary Garrison was severely injured in a fall at the Fryrear transfer station, which is owned and operated by Deschutes County. The transfer station was designed and built using 'Z-wall construction,' which consists of a concrete upper slab with a 14.5-foot retaining wall that drops to a concrete lower slab. The design allows persons using the transfer station to back their vehicles onto the upper slab and dump their garbage into semi-truck trailers that have been placed on the lower slab. There is a seven-inch railroad tie at the edge of the upper slab that serves as a barrier to warn drivers not to back their vehicles any further. At the time of Garrison's fall, there were no other barriers or fences on the upper slab, and there were no signs warning users of the danger of falling from the upper to the lower one.

"The design and operating method of the transfer station were chosen and implemented by Larry Rice, the public works director for Deschutes County, and Al Driver, the director of solid waste operations for the county. The design engineer was Tom Blust, who worked under the supervision of Dave Horning. The Deschutes County Board of Commissioners had delegated the design and operation decisions for the transfer station to Rice and Driver. In the process of adopting the design for the transfer station, Rice and Driver considered other design options, including installing a fence, railing or other barrier at the edge of the upper slab, and other operating systems, including having patrons dump their refuse on the upper slab so that it later could be pushed off the slab and into the trailers below by transfer station employees, but determined that those options presented their own safety problems as well as economic disadvantages.

"On the day that Garrison was injured, he and his wife had driven to the transfer station in their pickup with a load of refuse. Both had been to the transfer station before and, as at those earlier times, Garrison backed the pickup up to the railroad tie barrier and lowered the tailgate. When the tailgate was lowered, it protruded out over the edge of the upper slab. Both Garrison and his wife were aware of the distance of the drop from the upper to the lower slab and had discussed the importance of being careful so as not to fall. Garrison stood in the back of the pickup and threw the refuse over the edge and into the trailer below. When he was finished, he grabbed a lumber rail on

the back of the pickup and attempted to swing out onto the pavement of the upper slab. In doing so, he fell to the pavement of the lower slab, suffering severe injuries to his face, head, arms and chest."

162 Or App at 162-63.

Plaintiffs' amended complaint alleged that the county was negligent "[i]n failing to maintain a premises which is reasonably safe from dangers which were known or, in the exercise of reasonable care, should have been known to defendant by placing fences, barriers, or other protective devices next to the wall to prevent individuals from falling," and "[i]n failing to protect invitees from unreasonably dangerous conditions on the premises which were known to the defendant or, in the exercise of reasonable care, should have been known to the defendant by posting signs or other warning devices warning of the immediate drop off."

The county, relying on ORS 30.265(3)(c), moved for summary judgment. It contended that, although plaintiffs had couched their first specification of negligence in terms of the county's faulty *maintenance* (*i.e.*, operation) of the refuse station, the gravamen of the complaint lay in the station's allegedly faulty *design*; that is, the underlying basis for the allegation of negligence was the county's alleged failure to design the platform to include a railing or other barrier, thereby making the facility inherently dangerous to people dumping refuse there. The county contended that it was immune from liability for that type of claim under the doctrine of discretionary immunity. The county submitted affidavits establishing that it had delegated its authority for the design and implementation of the transfer station to the county director of solid waste operations, Driver, and to the county public works director, Rice, who then had complete decision-making authority to act.

The county further asserted that, as part of the design process, Driver and Rice had debated competing considerations such as the relative safety of the premises with and without the platform, the added maintenance and resulting cost of adding a fence, railing, or other barrier to the platform, as well as whether adding a fence, railing, or other barrier would make the platform more difficult or more

dangerous to use. According to Driver's affidavit, after debating those matters, they determined that a fence, railing, or other barrier would be more of a hazard than a help. Among other reasons for reaching that conclusion, they believed that refuse could become entangled in the barrier, creating a risk for patrons or employees attempting to untangle it; that refuse that was prevented from falling over the edge by the barrier could create a slip hazard; that many people would have trouble lifting their refuse over a barrier; and that a railing might give people a false sense of security, possibly resulting in a higher risk of accident. According to Driver's affidavit, some of the same concerns also led them to conclude that placing a fence, railing, or other barrier at the edge of the platform substantially would increase the county's cost to operate the facility because more personnel would be required to keep the area free of debris. In the end, they concluded that placing a railroad tie at the edge of the platform was necessary to ensure that no one backed a vehicle beyond where it was safe, but they rejected all other types of barriers to protect against falls.

The county contended that the foregoing decision-making process resulted in precisely the type of policy choice to which immunity under ORS 30.265(3)(c) attaches and that it was immaterial that, in hindsight, some might argue that a different design would have prevented plaintiffs' injuries in the present case. As for the allegation concerning the county's failure to warn plaintiffs of the danger presented by the platform, the county contended that the danger was not concealed and that plaintiffs admitted in their depositions that they were well aware of the danger, having dumped refuse there before.

Plaintiffs responded to the summary judgment motion by asserting that they had retained an expert who would testify at trial that the design of the transfer station was unreasonably dangerous. In addition, they argued that applicable Oregon workplace safety rules would have prohibited any county employees from working near the edge of the platform without fall protection. Plaintiffs acknowledged that those safety rules did not protect invitees to the premises expressly, but contended that the rules nonetheless set the standard of care in the present case. Finally, plaintiffs

asserted that the decision to design the transfer station without a fence, railing, or other barrier was not a policy decision entitled to immunity because (they claimed) the decision was made by "lower level employees" and because "no precautions of any kind were taken," notwithstanding that statutory or common law required that some precautions be taken. Plaintiffs offered no evidence to refute either the Rice or the Driver affidavits.

Respecting the second allegation of negligence, based on failure to warn, plaintiffs contended that the county had a duty to warn of any known dangerous condition on its land and had failed to do so.

The trial court granted the county's motion for summary judgment. In explaining its ruling on the first specification of negligence, the court noted that this was not a case in which the county failed to consider safety at all. The court stated that, whatever the applicable standard of care might be, and whatever plaintiffs' expert might say about the inherently dangerous design of the facility, it was clear from Driver's affidavit that he chose the design of the facility after careful consideration of various safety concerns raised by different design options, including those that plaintiffs favored. The court concluded that "[i]t's precisely this type of governmental decision that is appropriate for discretionary immunity, even if it's a dangerous design and even if it is negligent."

The trial court also rejected plaintiffs' failure-to-warn claim, based on what the court termed a "lack of causation." The court observed that the danger was open and obvious and, in light of plaintiffs' deposition testimony that they were well aware of the risk, the failure to warn did not expose them to any greater risk of harm than would have been present had they been warned. Accordingly, the court concluded that there was no genuine issue of fact or evidence in the record from which a reasonable juror could have found that there was a causal link of any kind between the failure to warn and the accident that befell Garrison.

Before the court issued its ruling granting the county's motion for summary judgment, plaintiffs filed a second amended complaint, which added a third specification of

negligence. In that amended complaint, plaintiffs alleged that the county was negligent in adopting an operating plan for the transfer station that required patrons to back a vehicle up to the edge of platform to dump refuse. The county moved for summary judgment on that claim as well, arguing that that design decision, like the one underlying the first specification of negligence, also was entitled to immunity, for the same reasons set out in its earlier brief. Plaintiffs responded by incorporating by reference their earlier arguments and by attaching, in whole, transcripts of the depositions of Driver and the county design engineer, Blust. Plaintiffs, however, did not make any particular argument based on those deposition transcripts nor did they point the court to any particular passage in those documents that would have supported their arguments. The trial court allowed the county's motion and dismissed the second amended complaint.

On plaintiffs' subsequent appeal, the Court of Appeals concluded that the circuit court did not err in granting summary judgment. As to plaintiffs' claims that the transfer station was unsafe because of the lack of a barrier at the edge of the platform and because it required people to back up to the edge to dump refuse, the Court of Appeals determined that ORS 30.265(3)(c) protected the county's decision-making process from liability in designing the site. *Garrison*, 162 Or App at 167. As for plaintiffs' claim that the county was liable for its failure to warn of the danger of the drop-off, the Court of Appeals agreed that the danger was an obvious one, that plaintiffs were fully aware of the danger, and, consequently, that the absence of a warning did not expose plaintiffs to any greater risk of harm than if they had been warned. *Id.* at 168-69. As noted, we allowed plaintiffs' petition for review.

■ Plaintiffs' first and third specifications of negligence, concerning the county's allegedly negligent design of the transfer station,[3] invoke the general common-law responsibility of all persons to avoid conduct that creates a specific

---

[3] As noted, plaintiffs' first specification does not allege negligence in the *design* of the refuse transfer station. Instead, the specification charges negligence in "failing to maintain" a facility with barriers to protect patrons from falling over the edge of the platform. We agree with the county, however, that the gravamen of that allegation is that the county's alleged failure to design the platform in a way that

risk of injury to others, as well as the special duties that a possessor of land owes to business invitees. In similar cases involving private landowners and occupiers, this court typically begins by examining the claims to determine whether the property owner's alleged conduct was unreasonable in the circumstances and created a foreseeable, unreasonable risk of harm to the plaintiff. *See Fuhrer v. Gearhart By The Sea, Inc.*, 306 Or 434, 438, 760 P2d 874 (1988) (illustrating proposition). A private landowner or occupier of land in a position similar to the county's would be required to take care to protect patrons on the premises from injuries resulting from known, dangerous conditions on the premises or, at least, to warn them of the danger. *Woolston v. Wells*, 297 Or 548, 557-58, 687 P2d 144 (1984).

Because this case arises out of a grant of summary judgment to the county, we assume that plaintiffs would be able to produce evidence at trial that the county, if it had been a private entity, would have been required to exercise care to protect plaintiffs from accidently falling over the edge of the platform while dumping refuse. We assume also that plaintiffs could produce evidence that the county was negligent in deciding not to install a barrier to protect patrons from falling over the edge of the platform and in designing the platform in a way that required patrons to back their vehicles up to the edge of the platform to dump refuse.[4] In other words, we assume that the county, were it a private party, could have been found liable to plaintiffs for their injuries.

The county is not a private entity, however. The question before the court, therefore, is whether the fact that

included protective barriers (other than the railroad tie that prevented vehicles form backing up too far) made the platform unreasonably dangerous.

[4] Plaintiffs attached an affidavit to their response to the county's summary judgment motion attesting to the fact that they had retained an expert qualified to testify at trial "to admissible facts or opinions creating a question of fact" with regard to each of the three allegations contained in plaintiffs' second amended complaint. We view that affidavit broadly and give plaintiffs the benefit of all favorable inferences. Accordingly, with regard to plaintiffs' first and third specifications of negligence, we assume that plaintiffs' expert would testify at trial that the county was negligent in maintaining (or designing) a premises that had no barrier or device other than the railroad tie to prevent people from falling and in designing a transfer station that required people to back their vehicles up to the edge of a platform to dump refuse.

the refuse station is not privately owned and operated alters the analysis. The answer to that question lies in the applicability of the OTCA, ORS 30.260 *et seq.*, which provides that public bodies generally are liable for their torts, except in certain limited circumstances.

In this case, the county has asserted throughout that one of those circumstances pertains here. It contends that it is entitled to "discretionary function" immunity under ORS 30.265(3)(c), which we again set out here for the convenience of the reader. That subsection provides, in part:

> "Every public body and its officers, employees and agents acting within the scope of their employment or duties * * * are immune from liability for:
>
> "* * * * *
>
> "(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

By its terms, ORS 30.265(3)(c) confers immunity on the county, as a public body, from liability for the negligent performance or nonperformance of a "discretionary function or duty." The OTCA does not define that phrase. However, the statute's meaning and scope have been fleshed out through years of litigation. For example, this court has discussed the meaning of the term "discretion" in ORS 30.265(3)(c) on several occasions. In *McBride v. Magnuson*, 282 Or 433, 437, 578 P2d 1259 (1978), the court stated that conduct is "discretionary" in the sense that immunity attaches to its negligent performance if the decision is the result of a choice among competing policy considerations, made at the appropriate level of government:

> "[I]nsofar as an official action involves both the determination of facts and simple cause-and-effect relationships and also the assessment of costs and benefits, the evaluation of relative effectiveness and risks, and a choice among competing goals and priorities, an official has 'discretion' to the extent that he has been delegated responsibility for the latter kind of value judgment."

This court also has stated that ORS 30.265(3)(c) extends immunity "to decisions involving the making of policy, but

not to routine decisions made by employees in the course of their day-to-day activities, even though the decision involves a choice among two or more courses of action." *Lowrimore v. Dimmitt*, 310 Or 291, 296, 797 P2d 1027 (1990).

■        Notwithstanding the foregoing, the court has stated that the "discretionary immunity" doctrine does not immunize a decision not to exercise care at all, if action of *some* kind is required:

> "A public body that owes a particular duty of care * * * has wide policy discretion in choosing the means by which to carry out that duty. * * * The range of permissible choices does not, however, include the choice of not exercising care."

*Mosley v. Portland School Dist. No. 1J*, 315 Or 85, 92, 843 P2d 415 (1992) (citations omitted). In other words, the decision *whether* to protect the public by taking preventive measures, or by warning of a danger, if legally required, is not discretionary; however, the government's choice of *means* for fulfilling that requirement may be discretionary. *See also Hawkins v. City of La Grande*, 315 Or 57, 65, 843 P2d 400 (1992); *Little v. Wimmer*, 303 Or 580, 588-89, 739 P2d 564 (1987); *Miller v. Grants Pass Irrigation*, 297 Or 312, 320, 686 P2d 324 (1984) (all to same effect).

■        Moreover, only those decisions that are made by officials in a position of authority are immune from liability. As this court stated in *Mosley*, "[n]ormally, a choice within the permissible range, in order to qualify for immunity, is one that has been made by a supervisor or policy-making body." 315 Or at 92. However, in assessing whether, in a particular case, a decision was made by the kinds of decision-makers to whom the statutory immunity was intended to extend, the emphasis properly is on the nature of the decision-making, not necessarily the level of office. "Although policy discretion is *more likely* to be found at or near the level of political responsibility, it is not simply a matter of the defendant's office but of the scope and nature of the choices delegated to him." *McBride*, 282 Or at 438 (emphasis added); *see also Bradford v. Davis*, 290 Or 855, 865, 626 P2d 1376 (1981) ("The question of immunity is * * * whether the defendant had been delegated responsibility for a policy judgment and

exercised such responsibility in the act or omission alleged to constitute the tort.").

In *McBride*, this court noted that an official has discretion to the extent that such an official has been delegated the duty to make a value judgment of the variety discussed above. 282 Or at 437. For example, in *Mosley*, the court held that a high school principal's decisions about the number and location of security personnel within a high school were "responsibilities entrusted by the school board and the superintendent to the school principal, who was the responsible policy-making official within the school." 315 Or at 92.

With the foregoing standards in mind, we turn to the facts of the present case to evaluate whether the decision to build and maintain the refuse transfer station without erecting barriers at the edge of the platform that might prevent people from falling and the decision to design the station so as to require people using the facility to back a vehicle onto the platform to dump refuse were decisions that involved the making of policy by people who had been delegated the authority to make that type of policy judgment.

We begin by observing that plaintiffs have not argued that the design and construction of a refuse transfer station is a "routine decision[ ] made by employees in the course of their day-to-day activities." Moreover, Driver's affidavit, which is undisputed, demonstrates that he and Rice, in the course of selecting a design for the transfer station, made various decisions that were of a type that this court previously has considered to be "discretionary" or "the making of policy": They considered various design options for the station; they evaluated the relative effectiveness, safety and risks, as well as the relative costs and benefits, of constructing the station with and without the platform; they also considered the added maintenance and resulting cost of adding a fence, railing, or other barrier to the platform, as well as whether adding a fence, railing, or other barrier would make the platform more difficult or more dangerous to use. In the end, they concluded that the design that they ultimately chose—a platform that required users to back a vehicle up to dump refuse, with no barrier other than the railroad tie to protect users from falling—was the safest, least expensive,

and easiest to use. Thus, in selecting the final design under those criteria, Rice and Driver exercised the kind of discretion that ORS 30.265(3)(c) protects—a protection that extends to the county's operation of the refuse transfer station in accordance with that design.

■ Plaintiffs have attempted to characterize that final design decision differently. They contend that the county had a duty to protect the public and that the county did not satisfy that duty merely by "considering" public safety and then deciding that safety measures would not be adopted, whether due to expense, inconvenience, or some other reason. In effect, plaintiffs assert that the county owed a duty of care to the public that used the refuse transfer station and simply chose not to exercise care. Under this court's decision in *Mosley*, they contend, that choice was not within the permissible range of options available to the county and, therefore, was not entitled to immunity.

Plaintiffs' argument is premised on a mischaracterization of the undisputed facts. According to Driver's affidavit, Driver and Rice actively considered the relative risks and benefits of including in the final design just the sort of fall protection devices that plaintiffs contend are required to protect the public. For various reasons, Driver and Rice concluded that protective barriers actually would make the platform *less safe*. We assume for purposes of this opinion that that conclusion might have been both wrong and negligently reached. Nonetheless, the uncontroverted evidence of that thinking process establishes conclusively that this is not a case in which the decision-makers simply disregarded their duty to protect the public. On the contrary, with their decision, even if it was flawed, they exercised their discretion and chose to protect the public in a particular way. Plaintiffs wish to argue that the county should have done something more, or something different, but that argument is the kind of second-guessing that is defeated by immunity under ORS 30.265(3)(c).

■ Plaintiffs also argue that the decisions that Rice and Driver made cannot qualify as discretionary ones because Rice and Driver are not the kinds of decision-makers to whom statutory immunity is intended to extend. They characterize

Rice and Driver as "low-level ministerial employees" whose decisions cannot be accorded protection under ORS 30.265(3)(c), because they were not at or near a "level of political responsibility." They maintain that the Court of Appeals, in ruling to the contrary, broadly expanded the discretionary immunity doctrine to include decisions made by "low-level functionar[ies]."

Plaintiffs have offered no evidence to support those contentions. On the contrary, they conceded that the county commission delegated the responsibility for designing and constructing the transfer station to Rice, the public works director, and Driver, the director of solid waste operations. Moreover, they have not disputed that the county commission was the county's highest decision-making body or that the commission had the authority to delegate that duty to Rice and Driver, although the decision was one that the commission could have made itself. In short, the undisputed evidence demonstrates that the safety design of the transfer station was the result of a discretionary policy judgment, made by individuals who had been delegated the authority to make that judgment.

■ Finally, and although plaintiffs asserted on summary judgment that they had an expert who would testify that the design for the transfer station that Rice and Driver selected was "unreasonably dangerous," such evidence indicates only an abuse of discretion.[5] It follows that, on the record before it, the trial court properly granted summary judgment to the county respecting plaintiffs' first and third specifications of negligence.[6]

---

[5] We agree with the following statement by the Court of Appeals:

"That [expert] testimony would go not to the question of whether defendant's decision took safety into account but, rather, would go to the question of the quality of the decision. Again, that is precisely what immunity is designed to address. If governmental bodies always made perfect choices, then there would never be a need to invoke immunity."

*Garrison*, 162 Or App at 167-68.

[6] The dissent's contrary view is based on a misreading of our cases, particularly *Miller*. In *Miller*, the evidence in the summary judgment stage suggested that the irrigation district had "wholly disregard[ed] and declin[ed] to consider whatever duty it had under tort law." 297 Or at 321. This case, as we have shown, is one in which the public body *did* consider its duty. Indeed, Rice and Driver believed that their choice represented a higher level of safety, *i.e.*, greater care, than plaintiffs' approach.

■    Both the trial court and the Court of Appeals held that the county also was entitled to summary judgment on plaintiffs' allegation that it failed to protect plaintiffs, as invitees, from an unreasonably dangerous condition "by posting signs or other warning devices warning of the immediate drop off," because that dangerous condition was obvious and the lack of any warning did not cause plaintiffs any injury. The Court of Appeals stated:

> "The issue is not whether plaintiffs were comparatively negligent, which is indeed a jury question, but, rather, whether the presence of a warning would have had any additional effect on plaintiffs' knowledge of the risk. In other words: Was there a causal link between the absence of a warning and Gary Garrison's injuries? If, on the summary judgment record, the trial court were able to conclude that the absence of a warning sign was not the cause of Garrison's injuries, then it would be appropriate for it to decide the issue as a matter of law."

162 Or App at 168. We agree with that reasoning.

Plaintiffs argue that *Woolston* stands for the proposition that even obvious hazards must be considered within a scheme of comparative fault. The court there stated:

> "Each party is held to the same standard of care with respect to common law negligence. Negligence is conduct falling below the standard established for the protection of others, or oneself, against unreasonable risk of harm. The standard of care is measured by what a reasonable person of ordinary prudence would, or would not, do in the same or similar circumstances. * * *
>
> "In general, it is the duty of the possessor of land to make the premises reasonably safe for the invitee's visit. The possessor must exercise the standard of care above stated to discover conditions of the premises that create an unreasonable risk of harm to the invitee. The possessor must exercise that standard of care either to eliminate the condition creating that risk or to warn any foreseeable invitee of the risk so as to enable the invitee to avoid the harm.
>
> "The invitee is required to exercise that same standard of care in avoiding harm from a condition of the premises of which he knows, or, in the exercise of that standard of care, of which he should know.

"Instructions to the jury should be framed in terms of
that standard of care. The jury will thereby be enabled to
determine whether any given party is at fault and if both
are at fault to compare that fault as the statute commands.
In determining and comparing fault, the jury must neces-
sarily consider the obviousness of danger and the ease or
difficulty with which harm to the plaintiff from that danger
could be avoided by either party."

297 Or at 557-58 (citation omitted).

Plaintiffs contend that the Court of Appeals' holding
is inconsistent with the foregoing directive. They assert that
the Court of Appeals effectively held, *as a matter of law*, that
there is no "causal link" when the invitee confronts a known
or obvious danger. They contend that that ruling violates
Oregon's comparative negligence statute.

Plaintiffs misunderstand the Court of Appeals' hold-
ing. The Court of Appeals did not make the kind of broad rul-
ing that plaintiffs describe. Instead, the court concluded that,
*on the undisputed evidence in this case*, there was no causal
link between the county's failure to warn and the injuries
that befell plaintiffs. That conclusion is well supported by the
evidence that plaintiffs were fully aware of the danger pre-
sented by the drop-off and the lack of a barrier at the edge of
the platform.

In the present case, the evidence on summary judg-
ment establishes that the county's failure to warn did not
expose plaintiffs to any greater risk of harm than if they had
been warned. Plaintiffs testified at length at their deposi-
tions that they had used the transfer station before, that they
knew of and always had been concerned about the drop-off
and the lack of a protective barrier at the edge of the plat-
form, and that they had discussed the importance of being
careful not to fall. Given that testimony, no reasonable juror
could find that a warning would have made a difference. The
Court of Appeals was correct in so holding.

The decision of the Court of Appeals and the judg-
ment of the circuit court are affirmed.

**DURHAM, J.,** dissenting.

For the reasons stated below, I believe that the majority misapplies the statutory immunity for the performance of a "discretionary function or duty" set out in ORS 30.265(3)(c).

I begin with the pertinent statutes. ORS 30.265(1) makes every public body subject to an action for damages for its employees' torts, "whether arising out of a governmental or proprietary function." The scope of that statute extends to defendant's operation of a refuse transfer site for the benefit of the citizens of Deschutes County.

ORS 30.265(1) is subject to certain exceptions. The issue in this case is whether defendant is immune from tort liability to plaintiffs by reason of the exception described in ORS 30.265(3)(c):

> "Every public body and its officers, employees and agents acting within the scope of their employment or duties, or while operating a motor vehicle in a ridesharing arrangement authorized under ORS 276.598, are immune from liability for:
>
> "* * * * *
>
> "(c)  Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

Plaintiffs contend that, on the date of the accident, defendant invited the public to use its refuse facility and that plaintiffs were business invitees at the time of the accident. According to plaintiffs, defendant knew that the large concrete garbage pit on the premises created an unreasonably dangerous condition due to the lack of any fall protection device, but failed to use reasonable care to eliminate the risk of injury to invitees or to warn of the danger.

Plaintiffs' claim invokes the legal duty owed by a land occupier to business invitees. This court summarized that duty in *Woolston v. Wells*, 297 Or 548, 557-58, 687 P2d 144 (1984):

> "In general, it is the duty of the possessor of land to make the premises reasonably safe for the invitee's visit.

The possessor must exercise the standard of care above stated to discover conditions of the premises that create an unreasonable risk of harm to the invitee. The possessor must exercise that standard of care either to eliminate the condition creating that risk or to warn any foreseeable invitee of the risk so as to enable the invitee to avoid the harm."

As the majority notes, because this case comes to us on review of a grant of summary judgment, we must assume the plaintiffs can produce expert testimony and other evidence, supporting the claims in their amended complaint and affidavits. Characterized in terms of the duty described in *Woolston*, the amended complaint and affidavits assert that defendant either failed to exercise reasonable care to discover the unreasonable risk of harm to invitees posed by the absence of any fall protection device at the edge of the refuse pit or, having discovered that dangerous condition, failed to use reasonable care either to eliminate the risk (such as by adding a suitable handrail) or to warn a foreseeable invitee of the risk.

Defendant's duty to business invitees, as described in *Woolston*, is not a "discretionary function or duty," to use the terms of ORS 30.265(3)(c).[1] Rather, defendant's duty, as

---

[1] In his concurring opinion in *Miller v. Grants Pass Irr. Dist.*, 297 Or 312, 323-24, 686 P2d 324 (1984), Justice Lent opined that the notion of a "discretionary duty," which the text of ORS 30.265(3)(c) embraces, is a contradiction in terms that detracts from a principled statutory analysis. He did, however, offer the following explanation, with which I agree, regarding the concepts of discretion and legal duty in the application of ORS 30.265(3)(c):

"I do have trouble envisioning a discretionary duty. ORS 30.265(1), speaking generally, makes the state or a local public body liable for its torts. In order for there to be a tort the actor must breach some duty imposed by law, that is, by legislative enactment (statute, rule, regulation, charter, ordinance, etc.) or the common law. The duty must be identified and proclaimed to exist by a court, as a matter of law, not fact. A duty either exists or it does not. The law either commands someone to act, or refrain from acting, or it does not.

"In this case, the Irrigation District chose to build and operate a dam. Having done so, it should be held to the same duty as would any person, natural or corporate, have in the operation of a dam and the impoundment of water, to protect those on the water from an unreasonable risk of harm arising from the District's activities in this respect. If legislation or the common law imposes a duty on a dam operator in these circumstances, there is nothing 'discretionary' about the existence of the duty, nor can it be described by that adjective.

"There may be, and probably is, room for discretion in choosing the manner of performance, both for a private person or a public agency, but the duty must be performed and the standard of care required by the duty must be achieved.

summarized in *Woolston*, is nondiscretionary. That is, the law has made a policy choice, for defendant as well as all other landowners and occupiers who invite customers to enter their property, that mandates compliance with the legal duty described in *Woolston*. As this court explained in *Miller v. Grants Pass Irr. Dist*, 297 Or 312, 686 P2d 324 (1984), a public body may have discretion in choosing how it will satisfy its duty to the public but it has no discretion to choose not to fulfill its legal duty:

> "If there is a legal duty to protect the public by warning of a danger or by taking preventing measures, or both, the choice of means may be discretionary, but the decision whether or not to do so at all is, by definition, not discretionary.
>
> "This is so whether the duty derives from statutory or from common law. * * * The law itself has made that much of a policy choice. When different precautions might satisfy this duty, however, the choice of which one to use may be discretionary."

*Id.* at 320.

Defendant does not dispute plaintiffs' proposition that the edge of the refuse pit was a known dangerous condition that obligated defendant to carry out the legal duty set out in *Woolston*. However, in evaluating defendant's choice of responses to the risks of harm posed by the public's foreseeable uses of the refuse pit, we must view the evidence in the light most favorable to the party opposing summary judgment.

The evidence discloses that defendant's agents identified at least two distinct, predictable risks of harm from the condition of the refuse pit and its foreseeable uses by the public. The first was the risk that the cars or trucks of customers might roll into the pit. The second was the risk that customers working near the pit, either in vehicles or on the concrete

---

"To sum up, a discretionary function is one concerning which the governmental agency involved has power to make a choice among valid alternatives, but if there is a duty imposed by law there is no choice but to obey. If there is no duty, to which adherence is required, then the agency is concerned with a function rather than a duty. I really don't know what a discretionary duty looks like."

work surface, might fall into the pit. Each of those distinct risks carried the potential for grave injury or death to defendant's customers.

Responding to its duty under *Woolston*, defendant's agents addressed the first of those risks by affixing a railroad tie to the concrete surface a short distance from the edge of the refuse pit. The railroad tie functioned as a wheel bumper to inhibit or prevent vehicles from rolling into the pit. Defendant makes no argument that defendant designed the wheel bumper as a device to protect people against the risk of falling into the pit.

Defendant's agents also considered the second risk, discussed above, that customers working in the area might fall into the pit. That risk of injury is precisely the risk that plaintiff Gary Garrison encountered and that produced the injury that gives rise to plaintiffs' claim. Defendant's agents, however, decided to take no action to protect customers from falling into the pit or to post a warning of the danger. They made that choice after considering such factors as the safety of the public and defendant's employees, the overall efficiency of the operation, and budgetary constraints.

The court must assume that plaintiffs would produce evidence to establish that defendant's agents' choice to erect no fall protection device at the edge of the pit created an unreasonably dangerous risk of injury to customers working at that location. The question is whether ORS 30.265(3)(c) renders defendant immune from liability because, in the face of the specific and affirmative legal duty set out in *Woolston*, defendant's agents considered the cost of compliance and other relevant policy criteria, but chose to take no action to carry out the legal duty.

The passage from *Miller*, quoted above, confirms that a public body has no discretion to decide whether to satisfy a legal duty imposed by Oregon common law. Defendant simply is incorrect in arguing (1) that the range of its permissible discretionary choices included the choice to do nothing to comply with the duty stated in *Woolston*, or (2) that its consideration of policy-related criteria, coupled with a choice to take no precautions against the risk of falls at the edge of the

pit, qualifies under *Miller* as a choice of means to satisfy the duty described in *Woolston*.

This court's cases refute defendant's argument. In *Fazzolari v. Portland School District No. 1J*, 303 Or 1, 734 P2d 1326 (1987), the court considered a school district's alleged negligence in failing to provide adequate security while student were on school grounds, and said:

> "We think that a school principal's failure to take any precautions whatever, if that was unreasonable, is not an exercise of policy discretion * * *, though a school board's choice between expenditures on security personnel or other types of safeguards might be."

*Id.* at 22 n 20 (citing *Miller*).

In *Mosely v. Portland School District No 1J*, 315 Or 85, 843 P2d 415 (1992), this court, citing *Fazzolari*, underscored the distinction between making a choice among various means that will satisfy the public body's duty to the public and making a "choice" not to fulfill a duty imposed by law:

> "A public body that owes a particular duty of care (such as that owed by a school district to its students who are required to be on school premises during school hours) has wide policy discretion in choosing the means by which to carry out that duty. * * * The range of permissible choices does not, however, include the choice of not exercising care. * * *"

*Id.* at 92 (citations omitted).

Finally, in *Miller*, the court considered and rejected defendant's argument that, because choosing among different means to satisfy a legal duty involves elements of policy, a "choice" by a public body not to satisfy its legal duty to the public also is a discretionary function:

> "ORS 30.265(3)(c) provides immunity against '[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty.' A claimant might argue that when safety precautions of some kind are obligatory, the function or duty simply is not discretionary and ORS 30.265(3)(c) does not apply. But this would mean that even when a precaution is chosen, negligence in making that choice, that is to say, in the performance of the

function, is no more immune than failure to perform it altogether. *A defendant, in turn, might argue that as long as the choice among different precautions involves significant elements of policy, taking into consideration competing values, consequences, and priorities, the function is discretionary, and total disregard of the duty is as immune as failure to perform it before the injury has occurred.*

"The concept of a 'discretionary function or duty' is notoriously obscure and difficult, but *we do not believe the legislature intended either of these extreme results.* One extreme would swallow up the concept of discretion by holding a public body liable whenever it is found not to have actually satisfied its tort duty. *The other extreme would put a premium on ignoring the duty and simply failing to exercise the function of choosing among safety measures.* The dilemma posed by the statute is not inescapable. Rather, we conclude that the line runs between the extremes. The line runs between deciding whether to take precautions, a duty which under the circumstances of a particular case may not be discretionary, and deciding what precautions to take, which may or may not involve discretionary policy issues. That question, in turn, depends on the kind of examination set out in *Stevenson v. State of Oregon* [, 290 Or 3, 619 P2d 247 (1980),] and the other decisions cited above."

297 Or at 320-21 (emphasis added; footnote omitted).

The emphasized passages from *Miller*, quoted above, confirm that the legislature chose not to immunize a public body's decision to ignore a duty imposed by law to adopt safety measures to protect the public. The majority correctly describes *Miller* as a case in which the public body " 'wholly disregard[ed] and declin[ed] to consider whatever duty it had under tort law.' " *Garrison v. Deschutes County,* 334 Or 264, 277 n 6 (quoting *Miller,* 297 Or at 321). The majority then attempts to distinguish *Miller* by describing this case as one in which the public body *did* exercise care, and that defendant's agents believed that their "choice" demonstrated "a higher level of safety, *i.e.*, greater care, than plaintiffs' approach." *Id.*

For several reasons, the majority's attempt to analyze and apply *Miller* falls well short of the mark. *Miller* pointed out that the public body in that case had failed even to consider what its duty might be under tort law. The court

relied on that circumstance to conclude that a court cannot say that a public body has reached an immune decision regarding governmental policy if it has not even considered its legal duty under the circumstances. But the court in *Miller* did not hold that the converse is true, *i.e.*, that a public body is entitled to immunity merely for considering what its legal duty might be under the circumstances. The passages from *Miller*, quoted above, confirm that the court rejected that view as an extreme one that the legislature did not intend.

More puzzling is the majority's effort to portray defendant's conduct as an "exercise [of] care" that defendant's agents *believed* to be more safe than what plaintiffs sought. *Id.* The assertion that defendant did exercise care in designing the refuse pit contradicts the majority's assumption that defendant's decision to forego any fall protection devices "might have been both wrong and negligently reached." *Id.* at 276. Moreover, because the case is before the court on summary judgment, we must construe the evidence in the light most favorable to plaintiffs. In view of the contention of plaintiffs' expert witness that the design of the refuse pit was unreasonably dangerous, the majority's conclusion that defendant exercised care is both irrelevant and impermissible. Lastly, the mere belief of defendant's agents in the greater safety of their design is irrelevant. Plaintiffs rely on defendant's failure to take any precautions to eliminate the known risk that customers might fall into the refuse pit—a nondiscretionary legal duty imposed by Oregon law. *See Woolston*, 297 Or at 557-58 (describing legal duty). While the confidence displayed by defendant's agents is understandable, it does not justify immunizing defendant for failing to adopt any precautions against a known risk of injury from falls, in accordance with Oregon law.

This is not a case in which defendant made a choice to use a device to protect against falls, but the device simply failed to function. Rather, defendant seeks discretionary immunity for its decision not to use any protection against the risk of falling, *i.e.*, choosing not to use reasonable care to "eliminate the condition creating that risk or to warn any foreseeable invitee of the risk so as to enable the invitee to avoid the harm." *Id.* at 558. Defendant's argument, carried to

its logical conclusion, would immunize a public body's decision to disregard its nondiscretionary legal duty, simply because the public body believed that its policy reasons for avoiding its legal duty were superior to the policy reasons that supported creation of the legal duty in the first instance. The legislature did not intend that construction of ORS 30.265(3)(c).

Because defendant has not demonstrated that it is entitled to immunity from liability at this stage of the proceeding, the trial court should have denied defendant's motion for summary judgment. Accordingly, I respectfully dissent.